Okay, our final case this morning is No. 17-1272, Stambler v. MasterCard International Inc. Mr. Bumgardner. Thank you, Your Honor. May it please the Court. Mr. Stambler's brief raised four issues for appeal, and today I want to focus on issues one and three, but I'm, of course, happy to answer questions that you have on any of the issues. So let me first start with issues. Let me see if I can understand this a little bit better. If I understand Davies, what Davies shows, or at least what the Board found that Davies shows, is that the token has information in it, has received information which is in it, about the user and the user's account. And that then information is entered into the terminal about the payee and the amount, and that the token sends the information about the user to the terminal which creates the check and sends it back for a signature to the token. And the token then forwards it to the terminal, and the terminal sends it on. If that is the correct understanding of what Davies shows, do you lose? On that particular point, if it is true, this is issue two, Your Honor, it is true that the customer identity field is stored in the blank check on the Davies token. If this field is read by the terminal, assembled into a check, and then returned to the token, then under MasterCard's theory that was apparently adopted by the Board, it's not entirely clear, then that is what they say is the act of receiving information for identifying the account. Try to answer my question, because I gave you a description of what my understanding is of what the Board said about Davies. And if my description is correct, do you lose? If your description is correct, then we would lose on issue two. What issue would remain? Issue one, the single party construction. And issue three, the fact that Davies does not disclose information for identifying the account of the payee. Those are separate issues. Okay. So, Your Honor, if you would take a look on this point, at the red brief on page 34, this is the part of MasterCard's brief where they talk about the Davies system. And there's no question that they say the receiving act of the account information for the first party takes place when a completed check comes from the terminal back to the token for signing. So, they point to four statements. But the token has to have received, quite apart from that theory, the token has to have received information about the user, right? Because it has the information in the token. That's correct. And the problem, but that's not the end of the story. Because the claim itself has very strict sequencing requirements. For example, the claim steps must be performed in order. And furthermore, there must be a credential issue, we would say, before any of these steps occur. And so, the pre-programming of the token with the customer identity field takes place by the card issuer's bank. And then that token is given to the customer. That is what they also say is the previously issued credential limitation. So, if you just say that the customer identity field being stored on the token is the act of receiving, then you trip up on what we say is a proper reading of the credential being previously issued. Because the field would be... A position which the board rejected, right? The board rejected our construction of a credential being previously issued. And I would point out that is not MasterCard's theory. No, I understand. So, what they're saying is the token receives this information when the customer identity field ping-pongs back and forth. If you look at what's on page 34, these are the four statements of Davies that they point to. And I would like to focus on the third point that they make, where it says the customer's request, i.e. an electronic check, is formed into a message and presented to the token. Davies does not equate a request with the electronic check. The request that the user could form at the terminal could only contain the variable information which is sent to the token. And at the token, the electronic check is assembled. But the point is Davies... But the board interpreted it as, as I understand it, as saying that the terminal has the user information which it uses to prepare the electronic check, which is then sent back to the token for authorization. Your Honor, the board's decision on this point is two sentences long. And so they really don't make any factual findings about what Davies discloses. They simply say, let's look at the reply brief, and they do cite some points from Davies. But it's really this fourth point that drives the point home that Davies does not disclose a completed electronic check coming back from the terminal to the token. If you focus on point number four, it says the check enters the card, not the token, from the terminal. But the terminal has to have the user information, doesn't it? Pardon? The terminal, in order to prepare the check, has to have the user information. Davies doesn't disclose that the terminal is the one that actually assembles the check. The blank check information, which includes the customer identity field, is stored on the token. Davies does not say, contrary to what MasterCard's position is, there's nothing in Davies that says this assembling process of a completed check in the token embodiment takes place at the terminal. It's not in there. And I would like to direct the board to this point in Davies. So your theory is that the terminal doesn't prepare the electronic check, but that the electronic check is prepared by the token? Whereas the board found that the token just adds the signature? If you would take a look at page 41. But tell me. So our position is that Davies does not disclose the electronic check being fully completed at the token and then sent, I'm sorry, at the terminal and then sent back to the token for signing. The part of Davies that talks about that happening, which is shown. So your theory is the token prepares the electronic check based on limited information supplied by the terminal? The token has a blank check, so to speak, that includes customer information and bank information. All the token needs is the variable information. And one can speculate about how this happens in Davies, but the most logical thing to assume is that this variable information is input in the terminal and sent to the token where it's assembled and signed and then deposited into the system of Davies. If you look at Davies on page 41 of our blue brief. It sounds to me as though we're arguing about what Davies discloses. The board's interpretation of what Davies discloses, right? Rather than some claim construction issue. Well, I would say it's a little bit deeper than on this particular point, Your Honor. On page 41 of the brief, this is the section of Davies. 41 of your brief? Yes, Your Honor. I'm sorry, the blue brief. That's right. On page 41 of our blue brief, at the bottom of the page that we've indented, this is a section of Davies where MasterCard gets the position, the check enters the card from the terminal. And you'll see that this part of Davies says, the smart card in its current form depends on a separate terminal for input and output. And this is a security risk in several ways. So what we're talking about here is a smart card system that Davies is saying is flawed and that Davies wants to improve upon by use of this token. Now you get down to the check enters the card from the terminal, the part that I've underlined. MasterCard never, ever goes beyond that part of the sentence. They just put an ellipsis. But if you read the whole thing, it says the check enters the card from the terminal and the card owner cannot be entirely sure what is being signed. So this is talking about a smart card embodiment that Davies is trying to improve upon through use of the token. If you go further down, it says to avoid these serious risks, almost the whole signature operation should be under control of the owner of the secret key. The pen and keyboard should be part of the token. So the point here, Your Honor. I don't see that that contradicts the board's interpretation. Well, the point of this, Your Honor, is that you have a smart card system that Davies says, I want to make it better with a token. And the only disclosure that Davies says in the smart card, the completed check enters the smart card from the terminal. But it says that's a security risk. You don't want this information leaving the smart card or the terminal and being sent up to the token because then it leaves the possession of the secret key holder. And you don't know what's being signed. So what Davies says is we're going to improve that with this token system where it's got a keyboard and a display so you can see what you're signing. The point of this is that MasterCard's theory is anticipation. And as this court is well aware, you have to show a single embodiment with all the limitations of the claim. And MasterCard's relying on part of a smart card embodiment that's being discredited by Davies for one part of the claim limitations. And for the other part, it's relying upon the token embodiment, two separate embodiments. And so that's a problem for MasterCard. Your Honor, if I could turn to the first issue, unless you had any further questions on that. Go ahead. So the first issue concerns Claim 51's four steps. And it's our position that all of these steps must be performed by the party that is authenticating the funds transfer information. But there's an embodiment in the specification which shows otherwise. Go ahead. Well, let's talk about that embodiment because the claim language of Claim 51 expressly excludes that embodiment. And I can tell you why. In Claim 51, the first step is receiving funds transfer information. And then each subsequent step acts on the received funds transfer information. So we're talking about Claim 51 is dealing with the same set of information. Claim 51's third step is determining the authenticity of this information. So the information at issue may or may not be authentic. That's the point of the claim is you need this authenticating party to figure out if this information is authentic so it can transfer funds. In the patent, that authenticating party is the originator's bank who's shown in Figure 8B. And it's undisputed. MasterCard does not dispute that the claim steps read on the alternative embodiment where all these steps are performed by the originator's bank. Now, the fact that this information in Claim 51 may or may not be authentic excludes Figure 7 from consideration. Because as we said in our reply brief, the information that is input in Figure 7 is the gold standard information. That's the information you know is authentic. And what you're trying to figure out in this process is after it leaves the check originator in Figure 7, passes to a check recipient, then goes through a network, and finally reaching the originator's bank. You want to know if someone's changed this information. And so when the originator's bank gets this information in Figure 8B, it says, is this information authentic? Is it the same as what was entered way back in Figure 7? And so Figure 7 is the gold standard. The information that is received in Claim 51 has to be the information received at the originator's bank because it may or may not be authentic. And one other point on this, the claim step is receiving funds transfer information. That's the first step. And the third step is determining authenticity of the received funds transfer information. So the party that does the determination of the received funds transfer information is determining authenticity of what it received back in the first step, not some information that a different party received at a far earlier point in time. Indeed, the originator's bank, it has no access to the information that was originally created in Figure 7. It only has access to the information it receives. And it's critical that the originator's bank determine authenticity of that information because that's the information it's being asked to pay upon. And so the information back in Figure 7 is the original information. The information in Figure 8B is the information that needs to be authenticated. And that's why Figure 7, there's no receiving step that can apply to Claim 51 because we know that information is the gold standard. It's not a disputed authenticity. And I see I'm running low on time, so unless you have any questions, I'll reserve the rest for rebuttal. Okay. Mr. Williams. Thank you, Your Honor. May it please the Court, Elliot Williams for MasterCard. I'll go in the same order that my opposing counsel did, which is to begin with the issue relating to Davies' disclosure. As to whether the Board found that in Davies' the terminal prepares the check, sends it into the token, the token signs the check, and returns it to the terminal, there's no doubt the Board made that finding. It's a finding that's supported by the text of Davies' as well as the testimony of our expert, Whit Diffie, who the Board explicitly relied on in its final written decision. So if you look, for instance, at A56, that's the final written decision. Excuse me, appendix page 56, that's the final written decision. Page 21 of the final written decision. At the bottom of that page, there's a paragraph, the last full paragraph on the page, the last sentence of that says, Furthermore, Davies discloses that a terminal can be used to generate a check, sign it with the aid of the token, and send it to the beneficiary. That's a finding of fact that the Board made in reaching its conclusion subsequently that Davies anticipates. And what in Davies supports that conclusion? Yeah, multiple things. So, most of them are around pages 831 and 832 of the record. Well, I guess that question plus, I mean, what in the Davies reference discloses that the check comes back from the terminal? For the terminal or from the token? I'm sorry. Well, the check is, goes, if I understand from the terminal to the token for signature, right? Correct. Right, so what is it that, give me Davies, just to go at a level of generality that's farther back. Okay, let's back up. What is the sequence of events that Davies describes with respect to where the check goes and where it doesn't go? Sure, so that's easiest to explain with respect to the figure on page 833 of the record, which is figure 10.23 of Davies. Right. And here he's depicting how the system would be used to do an ATM transaction, so you're withdrawing money. What he shows in figure 10.23, the bottom left side of that figure shows the token. Right. This is the intelligent token. And the terminal is right above it. The terminal is above it. Along with the keyboard where you make the request. Correct. And so there's an arrow from that keyboard going into the token. All right. That's the beginning of this process. So you go up, you say, I want to make a withdrawal, type in whatever you need to type in to start that process. That terminal then creates a check message, assembles the message appropriately for the request. When you say that, the terminal then responds to the request. You key in the request. The terminal prepares, call it a check, call it a message. It's data that pertains to the transfer. Correct. And that data is shown in figure 10.22. And that goes to the token. To the token. And one of those things, for instance, would be the withdrawal amount. How much do you want to withdraw? You type that in. Right. Otherwise the machine has no idea. All right. That goes into the token. All right. The token then, the last thing that token needs to do to make that a check that can then be used to complete the transaction is sign it. That's right. Whatever electronic devices used to do that. Yeah. It makes a cryptographic calculation to do that. That's right. Then that is the sign message. Now, because it needs that data or you're not going to get your money, you've got to sign that transaction using this token. It then goes back, and that's the arrow shown going up, into the ATM. To the C. I'm sorry? To the C. Yeah, C, correct. All right. And then from there, that ATM, because in this particular example, it's not your bank. You're using someone else's bank to withdraw the money. The message has to go to your bank to verify that, yeah, you signed the message and that you have enough money to complete this withdrawal. So that's how Davies works in a nutshell. All right. For the details as to where the token, where the discussion of how the check is assembled appears, as I said, going back to Appendix 831, the middle paragraph in that page that begins, a corporate customer, if you skip down about halfway through, there's a line that says, a terminal is needed in order to generate a check, sign it with the aid of the token, and send it to the beneficiary. That's one clear place. This gets repeated again, for instance, on 832, the last two lines on that page, describing Figure 1023, the customer's request is formed into a message and presented to the token. Here it is signed, et cetera. And then there's further description on 833 as well. So in any event, I think that's more than sufficient evidence for the board to conclude that, in fact, that's what happens in Davies, which is what they did conclude in the final written decision. Unless there's any questions about that issue, I'd like to return then to the claim construction issue. This one, I think, is fairly easy, although certainly Pallant has presented some creative arguments to make it look more difficult than it really is. Here we have a method claim that includes four steps. The method's not limited to any particular entity performing those steps. It doesn't say what entity has to perform the steps. It doesn't say that a single entity does have to perform all of these steps. And this court's law is clear that the inventor is entitled to the full scope of his claim, and you're not going to limit it to these embodiments from the specification, especially not ones that are not depicted in the figures and are described as alternative embodiments. Here there's nothing in the claim that says a single entity has to perform these steps. If you read carefully the arguments that Pallant has made about their claim construction, you'll notice none of them actually require there be a single entity performing these steps. They make arguments about what individual words within these claim steps might mean and how the individual steps might have to operate on data together, but no claim construction has been proposed for any of those things. So, for instance, you heard them talk about the gold standard and that some data here has to be the gold standard. That's not in the claim. Are they seeking a construction that would require that the data, that the provenance of the data was uncertain at some particular time in the claim? I mean, if that's their argument and they want to put that into the claim, they can argue for such a construction, but they haven't. All they've argued for is a construction that a single entity has to perform these four steps. Nothing in the claim language supports that. Nothing in the specification supports that. In fact, as we pointed out, as the board noted, the specification is inconsistent with such a reading because there are two embodiments and the specification makes clear that both of them are supposed to be within the scope of its transaction authentication scheme. So, when you say that counsel make creative arguments, I was listening to that and let's just go back a little bit to the ATM example. How many entities are involved in that? I mean, you do acknowledge that there's at least one entity, right? Yeah, I mean, I think in terms of if you look at Davies and look at where those four steps are performed in connection with that ATM example, then we argue that you could put all four of those steps as being performed by the originator's bank. So, the person who's holding that card, the person who's withdrawing the money, actually it's their bank that's arguably doing all four of those steps because at least two of them are done in this token, in this intelligent smart card. But that's not what the board found, right? Well, no, the board didn't because the board concluded, as it should have, that you don't need to show that all these steps are performed by the same entity. The board just said, no, the claim says there's four steps and Davies has four steps. They didn't need to go further. You only have to reach this question if you were to agree with Mr. Stambler's counsel that all four steps have to be performed by one entity. And then we had the alternative theory argued to the board that wasn't reached, that all four steps are performed by a single entity, meaning the originator's bank, because that's the entity that programmed the smart card and put the key on there and designed the smart card to work in a certain way, and that receives the data on the back end and does the verification of the signature in order to authorize the funds transfer. So, in other words, even if you were to accept their construction, the board certainly could have found that all these steps are performed by a single entity. You alluded to this point a moment ago, but I wanted you to expand on it, if you would. The question that is raised by your opposing counsel about why it is that you would need to determine authenticity of received funds transfer information if that information is being provided at the first step when the user inputs that information, presumably authentic at that point. Well, I mean, the point of this whole system is to verify that the funds transfer information that ultimately shows up for redemption is valid. So what you're saying, I take it from that, is that when you refer to funds transfer information, you're referring to that funds transfer information and all of its iterations throughout the entire path that it follows. I am, and that is how the specification seems to be using the term as well, where it uses that same identification info in various places as this path has followed. You would say, I take it, correct me if this is a misconstruction of your argument, but I understand you to be saying that the funds transfer information, when it finally reaches a point at which there may have been some tampering, had better be the same as the funds transfer information that started out, and that's the authentication process? That's right. I mean, keep in mind, this claim covers just the scenario where it does match. This is the claim that talks about you verified that it matches, and therefore you authorized the transaction. So in the case that the claim cares about, it wouldn't have changed, but obviously the specification is trying to protect against the possibility that it might. So yes, that's right. I mean, I'll point out another thing about their argument, which is I think it goes too far, because if you take the logic of their argument, then this claim wouldn't read on the other embodiment either, because the last element of Claim 51 has you checking the VAN to determine if it's authentic. So this transferring a fund step in Claim 51, the last piece of it, that's based on whether or not the VAN is authentic. Under their reading, the VAN would have been created immediately prior to the step being performed by the same entity that's doing the checking, so it would make no sense. The way they're reading this claim is so narrow that this claim would no longer make any sense at all. There's no reason to adopt that construction. The board certainly didn't. I think the more natural reading is just to say, yeah, what they mean here is these four steps in the way that the specification describes them, the two different ways the specification describes them, it's clear in the specification. Column 2, for instance, talks about both ways in the summary of the invention and says they're both part of a transaction document processing, which avoids these prior art systems. And then there's no dispute that the way of doing this that's actually shown in the figures is one that involves multiple entities performing these steps. So the board's conclusion was eminently reasonable. Again, this is not a case where the broadest reasonable interpretation applies. The Phillips standard applies, but under any of this Court's jurisprudence, the way the board construed this claim is very reasonable. And I would also point out, actually, in reaching it, it is noteworthy, although we didn't address it in the brief, which I concede, but the board did in its claim construction appear to rely on the testimony, on expert testimony, which would give further reasons to defer to what the board's construction was here. And you'll see that in the final written decision at appendix page 50, where in construing the claims there was reference made to Mr. Dibby's deposition testimony. So those are the two issues that were argued. Unless there's any other questions, I can yield back the remainder of my time. No, thank you. Thank you, Mr. Williams. Mr. Baumgartner, I think you have a little over two minutes. Thank you, Your Honor. So there is no question. MasterCard agrees in the red brief and in the CBM that this claim covers the situation where the originator's bank receives information, generates a new VIN, authenticates the information by comparing the VIN it regenerated in figure 8B to the original VIN in figure 7, and if those things check out, it transfers funds. Those four steps, it is agreed to by MasterCard and the board, are within the scope of claim 51. That is the alternative embodiment in our brief. Now, the preamble of this claim is a method for authenticating the transfer of funds. And notably, figure 8B and the alternative embodiment are described in the patents as the authentication process. If you look at figure 7, figure 7 is described as describing the check issuance process. And there are other claims like claim 89, which is directed to a method for authenticating or a method for originating a check or payment instrument. So the preamble of these claims tells you that Mr. Stambler was familiar with his workflow and he was claiming different parts of his invention with different claims. That's completely normal. Now, there was a suggestion that this info that flows through the system is always the same info. That could not be further from the truth. Consider the negative situation where the information is input by the originator, checked for $100, that goes to the recipient, he decides to add a few zeros. It's that fraudulent information that makes it to the originator's bank for authentication. And so when the originator's bank gets that, the patent absolutely considers this to be two separate sets of information. Look no further than block 60 in figure 8B, where you have two pieces of information that are put into a comparator to determine whether they're the same. So the patent absolutely considers the set of information received in 8B, which is of disputed authenticity, to be different than the set of information input at the very beginning of this process, which is the gold standard. And so it's completely erroneous for MasterCard to say that it's the same information that flows through the patent. That is not... It's all funds transfer information. It may, at some point, as you suggest, be rendered fraudulent. Correct. But it's still funds transfer information, right? Correct. Because if you say that the task here and the determining step is to determine whether at least a portion of the received funds transfer information is authentic, that contemplates that the information may be exactly the same as was initially input, or it may not. But it's still funds transfer information, right? It's still funds transfer information, but the point is that Claim 51 doesn't talk about just funds transfer information. It talks about received funds transfer information that needs to be authenticated. And that information is received in the claim's first step. So the party that does the authenticating in the claim's third step is authenticating received funds transfer information that it got in the first step. But aren't you saying, in effect, that it needs to be authenticated under your construction at the initial stage as opposed to at some point during its travel through this sequence of transactions? Absolutely not. It must be authenticated when it reaches the originator's bank and they're asked to pay money on it. At the beginning of the transaction, when you issue a check that floats through this system and is passed from party to party, that information doesn't ever get authenticated until you get to the very end process where the originator's bank gets these instructions it receives and says, I have to authenticate this. But why is that a problem? That's determining authenticity. Correct. That's a problem for MasterCard and the Board's construction because the claim is contemplating that this received funds transfer information may be fraudulent. Right, at the point at which it ultimately arrives at its destination. Correct. But why isn't that exactly what Davies does? That is why this claim has to be construed as requiring one party who authenticates the funds transfer information to perform all steps. And the problem with Davies is that the Board relied on two different parties, the customer using its token and the customer's bank, as each performing two of those steps. Okay, thank you. Thank you, Mr. Baumgartner. Thank you. Both counsel cases submitted. That concludes our session for this morning. All rise.